COURT OF APPEALS OF VIRGINIA


Present:   Judges Kelsey, Beales and Senior Judge Annunziata
Argued at Chesapeake, Virginia


NETTIE L. BAILEY
                                                                    OPINION BY
v.        Record No. 2057-08-1                          JUDGE D. ARTHUR KELSEY
                                                                    MAY 26, 2009
SETH A. BAILEY


                    FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                                    James A. Cales, Jr., Judge

                        G. Michael Price (Connor & Price, P.C., on brief),
                        for appellant.

                        Kim M. Crump for appellee.


        In this divorce case, the trial court refused to enforce a marital agreement purporting to

transfer all marital assets to wife and all marital debts to husband upon divorce.  The court found

that husband — a schizoaffective psychotic on weekend furlough from a psychiatric ward of a

hospital — lacked the requisite mental competence to execute the agreement.  On appeal, wife

argues the evidence failed to prove incompetency as a matter of law.  We disagree and affirm.


                                                    I.

        When reviewing a trial court's decision on appeal, "we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003) (citations omitted).

"That principle requires us to discard the evidence of the appellant which conflicts, either

directly or inferentially, with the evidence presented by the appellee at trial."  Brandau v.

Brandau, 52 Va. App. 632, 635, 666 S.E.2d 532, 534 (2008) (citation omitted).

Seth A. Bailey (husband) and Nettie L. Bailey (wife) married in 1983. Husband served as an officer in the United States Navy until the early 1990s, when Navy doctors diagnosed him to be suffering from chronic and severe schizoaffective psychosis. Because of his mental condition, husband was discharged from the Navy as totally disabled and has not worked since. "Many times" over the course of the marriage, wife testified, husband would become "totally incoherent" and need to be hospitalized to regulate his psychotropic medications.

On June 14, 1995, husband was hospitalized after wife reported he was experiencing hallucinations involving homicidal and suicidal voices. He was "out of control," wife testified. During a weekend furlough, on July 16, 1995, wife presented husband with a document entitled "Contract of Marriage."[1] Wife warned husband that he could never return home again unless he signed the agreement. She also made clear that if he did not sign the agreement she would divorce him. "[I]f it wasn't for me," wife added, "you'd be homeless." Husband signed the agreement and returned to the hospital's psychiatric ward the same day.

Drafted by wife, the "Contract of Marriage" recited that the parties desired "interpersonal immunity to foster a harmonious living environment." Contract of Marriage at preface (July 16, 1995). To accomplish that goal, the agreement provided the parties "would not be bound by certain legalities of marriage." Id. Instead, the agreement provided:

- husband would execute a power of attorney authorizing wife to solely manage "all financial matters of this marriage,"

---

[1] Wife testified husband signed a predecessor agreement in 1985. Among other things, this earlier contract stated that husband had "defamed the character of and caused personal injury to" wife. Contract of Marriage at ¶ 1 (Aug. 8, 1985). Apparently as compensation for this loss and for the benefits of a "harmonious and conjugal relationship," id. at preface, the 1985 contract required husband to support wife's children from a prior marriage; transferred all assets to wife and all debts to husband; authorized wife to "accelerate payment" and "require collateral" at her election; and obligated husband to pay wife $10,464 a year. Id. at ¶¶ 1, 3. The enforceability, if any, of the 1985 contract was not litigated in the trial court or argued on appeal. We thus offer no opinion on the subject.

- all debts incurred during the marriage would be solely attributed to husband,

- all real and personal property acquired during the marriage would become the sole property of wife upon dissolution of the marriage, and

- husband would pay wife "continuous and adequate support" in the event of a divorce.

Id. at ¶¶ 4(a) to 4(f). Wife claimed husband read the agreement and understood its provisions. Husband testified, however, he "didn't read any of it." All he understood, husband testified, was that he was "[s]igning a document to go home."

A friend of wife's testified he saw husband sign the agreement and that husband appeared at the time to be of sound mind. Wife's friend, however, was unaware of husband's inpatient psychiatric status on the day the contract was signed. Challenging the friend's motives, husband testified the witness was not present and did not observe husband sign the agreement. "So he lied when he said he was there and watching you sign it?" counsel asked. "As far as I'm concerned," husband responded, "that's what the gentleman did."

Husband's treating psychiatrist, Dr. Alison Lynch, recalled him explaining to her on July 17 that he had to sign the document because wife "would not let him come home" if he refused to do so.[2] Asked by wife's counsel if husband understood the agreement, Dr. Lynch answered: "Yes, I believe he did understand what he had signed, *but . . . .*" Before Dr. Lynch could finish the "but" caveat, counsel interrupted with another question.

Later in her testimony, Dr. Lynch reiterated her expert opinion that husband was "not competent" at the time he entered into the agreement. Because of his deteriorated psychiatric condition, Dr. Lynch opined, husband lacked the mental "capacity to manage his affairs and make decisions in his best interest." He appeared "helpless" and "didn't know what to do or how

---

[2] Husband testified that he has no recollection of speaking to his psychiatrist about the agreement.

to get himself out of this predicament." Dr. Lynch made this assessment based upon the Veteran Administration's definition of a mentally incompetent person as "one who because of injury or disease lacks the mental capacity to contract or to manage his or her own affairs, including disbursement of funds without limitation." 38 C.F.R. § 3.353(a).

The hospital discharged husband on July 18, two days after he signed the agreement. Though he was no longer having homicidal or suicidal voice idealizations, he was taking seven prescription medications for his psychosis and was scheduled for follow-up psychiatric evaluations. The hospital discharge summary, authored by Dr. Lynch, stated "[t]he patient is not competent."

A former Navy colleague, who knew husband since the 1980s, testified that husband's condition in 1995 could be best described as "an inward catatonic state" and not "really functional." "He seemed to be totally dependent, helpless," the colleague continued. He attributed this weakened condition both to husband's psychosis and to wife's reaction to it: "I would say it appeared as though she was abusive, neglectful, she took advantage of him, [and] she talked down to him as if he were a child." The colleague described husband as "docile" and "under the control" of wife.

Based upon this evidence, the trial court found husband mentally incompetent during his weekend furlough from the psychiatric ward and refused to enforce the "Contract of Marriage" he signed that weekend. The court also held, in the alternative, that the agreement was the impermissible product of coercion and had, in any event, been rescinded by a later contract. Because we find the trial court's incompetency holding sufficient to resolve this appeal, we offer no advisory opinion on the two alternative holdings. "In this case, as in all others, we seek to decide cases 'on the best and narrowest ground available' from the record." Kirby v. Commonwealth, 50 Va. App. 691, 702 n.2, 653 S.E.2d 600, 603 n.2 (2007) (citations omitted).

- 4 -

II.

Virginia law subjects property settlement agreements "to the same rules of construction and interpretation applicable to contracts generally," Fry v. Schwarting, 4 Va. App. 173, 180, 355 S.E.2d 342, 346 (1987), and makes clear such agreements "shall be valid and enforceable if otherwise valid as contracts," Hurt v. Hurt, 16 Va. App. 792, 797, 433 S.E.2d 493, 496 (1993) (citation omitted). The law presumes competency and places the burden on the challenging party to demonstrate incompetency by clear and convincing evidence. Drewry v. Drewry, 8 Va. App. 460, 467, 383 S.E.2d 12, 15 (1989).

A contracting party is competent if, at the time he executes the agreement, he had sufficient "mental capacity to understand the nature of the transaction and agree to its provisions." Jones v. Peacock, 267 Va. 16, 19 n.1, 591 S.E.2d 83, 86 n.1 (2004) (citing Hill v. Brooks, 253 Va. 168, 175, 482 S.E.2d 816, 821 (1997)). A party with sufficient mental capacity cannot disaffirm the agreement no matter how "ill-reasoned or ill-advised" it might be. Drewry, 8 Va. App. at 469, 383 S.E.2d at 16. While a contracting party must "understand the nature and consequences" of entering into the agreement, the "law does not require that one have the ability to make a reasoned judgment" concerning it. Id. at 468, 383 S.E.2d at 17-18.

"The resolution of conflicting evidence bearing on an individual's mental capacity is a factual determination to be made by the trial court." Id. at 467, 383 S.E.2d at 15. On this issue, as with all others, a factfinder's resolution of conflicting facts and competing inferences receives "the highest degree of appellate deference." Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006). A trial court, sitting as factfinder, participates "first person in the evidentiary process and acquire[s] competencies on the subject that we can rarely duplicate merely by reading briefs and transcripts." Thomas v. Commonwealth, 44 Va. App. 741, 758, 607 S.E.2d 738, 746, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005).

Therefore, the trial court's determination of such issue "will not be disturbed on appeal unless plainly wrong or without evidence to support it." Drewry, 8 Va. App. at 467, 383 S.E.2d at 15 (citation omitted).

Drewry best illustrates the interplay between the appellate standard of review and the issue of mental incompetency. In that case, the trial court was unpersuaded by the challenging party's evidence of incompetence. A psychiatrist testified that the wife was incompetent to "reason through any important legal document" because she was depressed about her poor marriage. Id. at 466, 468, 383 S.E.2d at 14, 15. The trial court, however, discounted the expert opinion because it "was based in part on fabricated and exaggerated information" and could not be considered "a totally reliable statement of her mental condition." Id. at 468, 383 S.E.2d at 16; see generally Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668-69 (1997) ("In determining the weight to be given the testimony of an expert witness, the fact finder may consider the basis for the expert's opinion.").

Eschewing the expert's opinion, the trial court in Drewry believed other witnesses including the attorney who drafted the agreement. They observed nothing about wife's behavior that caused them to "question her capacity to contract or whether she understood the terms and nature of the agreement." Drewry, 8 Va. App. at 468, 383 S.E.2d at 15. Based on this testimony, the court found the wife was competent to contract and deemed the agreement valid. Applying our appellate standard of review, we reviewed the evidence on appeal in the "light most favorable" to the prevailing party, the husband who sought to *affirm* the agreement. The question then became whether the evidence, viewed favorably to husband, "established *as a matter of law*" the wife's mental incompetence. Id. at 463, 383 S.E.2d at 13 (emphasis added). We deferred to the factfinder and affirmed.

The case now before us presents the opposite scenario. Here, the trial court accepted the expert's opinion as credible. While our appellate standard of review remains invariant, the party benefiting from it is different than in Drewry. In contrast to Drewry, we review the evidence in the light most favorable to the party seeking to *disaffirm* the agreement, husband, because he won the contested factual disputes in the trial court. To be successful on appeal, therefore, wife must demonstrate that, when viewed in this light, no subset of facts in this record could lead a rational factfinder to conclude by clear and convincing evidence that husband was incompetent when he signed the agreement. In our opinion, the record does not permit this conclusion.

Husband signed the agreement during a weekend furlough from the psychiatric ward of the hospital. He had a decades-long history of chronic and severe schizoaffective psychosis, a condition causing him to be totally disabled. He was admitted into the hospital on this occasion after hearing homicidal and suicidal voices, experiencing hallucinations, and being generally "out of control." The treating psychiatrist, Dr. Lynch, testified husband was "helpless" and "not competent" because he lacked "capacity to manage his affairs and make decisions in his best interest." A witness who had known husband since his Navy days described husband in 1995 as living in "an inward catatonic state" — a situation in which he was not "really functional" but rather "totally dependent" and "helpless."

Wife argues on appeal the trial court should have discounted Dr. Lynch's opinion because of her statement, "Yes, I believe he did understand what he had signed, *but . . . .*" Like the trial court, we find this statement pretermitted the real issue. In context, Dr. Lynch was saying nothing more than what husband told her: If he did not sign the agreement, he would end up divorced and homeless. That was the extent of his understanding. That observation did not render fallacious Dr. Lynch's ultimate opinion that husband was mentally "incompetent" because he lacked the mental "capacity to manage his affairs and make decisions in his best interest."

After all, the *true* "nature of the transaction," Jones, 267 Va. at 19 n.1, 591 S.E.2d at 86 n.1, was not simply a sign-this-or-be-homeless deal. It was instead a comprehensive contract that relieved both parties of "certain legalities of marriage" while simultaneously ensuring wife's right to control "all financial matters" pursuant to a power of attorney, wife's exclusive right to "all property" acquired during the marriage, husband's sole liability for "all debts" incurred during the marriage," and husband's duty to pay "continuous" spousal support to wife upon a divorce. See Contract of Marriage at ¶¶ 4(a) to 4(f).

In sum, we have neither the authority nor the inclination to second-guess the evidentiary weight the trial court placed on Dr. Lynch's expert opinion concerning husband's mental incompetence. "In Virginia, as in other jurisdictions, it is for the jury, or the court trying the case without a jury, to determine the weight to be given the testimony of expert witnesses." Ford v. Ford, 200 Va. 674, 679, 107 S.E.2d 397, 401 (1959). On this record, the trial court's factfinding cannot be set aside as "plainly wrong or without evidence to support it." Drewry, 8 Va. App. at 467, 383 S.E.2d at 15 (citation omitted).

III.

The trial court did not err in accepting the evidence of husband's mental incompetence and in holding the agreement unenforceable for this reason. We thus affirm.

Affirmed.